IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 15-553 |
| GEORGE SMITH | : | |

**MEMORANDUM**

**SURRICK, J.** **JUNE 20 , 2016**

Presently before the Court is Defendant's Motion to Suppress Evidence. (ECF No. 34.) For the following reasons, the Motion will be denied.

## I. BACKGROUND

On November 9, 2015, a grand jury returned an indictment charging Defendant George Smith with three counts of interfering with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a). Defendant entered a plea of not guilty on all Counts. (ECF No. 9.)

On February 24, 2016, Defendant filed a Motion to Suppress Evidence through his former counsel, Kathleen Gaughen, Esq. (ECF No. 21.) On March 9, 2016, upon consideration of Ms. Gaughen's Amended Motion to Withdraw (ECF No. 23), an order was entered permitting Ms. Gaughen to withdraw as Defendant's attorney, and Anthony Kyriakakis, Esq. was appointed to represent Defendant. (ECF No. 27.) On April 18, 2016, Defendant filed the instant Motion. (Suppress Mem., ECF No. 34.)[1] On May 9, 2016, the Government filed a Response. (Suppress Resp., ECF No. 36.) On May 23, 2016, a hearing was held on the Motion. (ECF No. 41.) At

[1] Mr. Kyriakakis has incorporated Ms. Gaughen's Motion to Suppress Evidence into the instant Motion. (Suppress Mem. 1 n.1.) Because both Motions are the same, we will dismiss the former Motion as moot.

the hearing, the Government presented the testimony of four witnesses. We found the testimony of those witnesses credible.

## II. FINDINGS OF FACT

On August 24, 2015, at approximately 4:35 a.m., an employee of the 7-Eleven located at the corner of Broad and Diamond Streets in Philadelphia called the police informing them that the store had been robbed at gunpoint. (Def. Ex. D-CD-2 Track 3 (on file with Court); Def. Ex D-10 (on file with Court).) The employee described the robber as a black male wearing a red hat and sunglasses, and carrying a black bag. (Def. Ex. D-CD-2 Track 3; Def. Ex. D-10.) The employee stated that the robber took "a lot of money out of three registers and a lot of Newport[] [cigarettes]" before fleeing on foot. (Def. Ex. D-CD-2 Track 3; Def. Ex. D-10.)

At approximately 4:38 a.m., Temple University Campus Police Officer William Butler received a flash radio broadcast description of the suspect. (Hr'g Tr. 7-12 (on file with Court).) The suspect was described as a thin black male, armed, wearing a red hat, a blue shirt, with sunglasses, and carrying a black bag. (*Id.* at 12.) The suspect was believed to be fleeing westbound on Diamond Street. (*Id.*) Officer Butler approached the 7-Eleven in his patrol car and began surveying the surrounding area. (*Id.* at 13-14.) Officer Butler received additional information, advising that the suspect was believed to be armed with a long silver revolver and wearing a dark blue shirt over a red shirt and long pants. (*Id.* at 14; Ex. D-CD-2 Tracks 6, 7, 8.)

Amon Jackson and David Swint, two Allied Barton security guards hired by Temple University to work with police in maintaining campus safety, also received a flash broadcast describing the 7-Eleven robbery suspect as an armed and dangerous black male carrying a black bag and wearing a red hat, navy blue shirt, and black pants. (*Id.* at 126-28.) Approximately 10 minutes after receiving the flash information, Jackson and Swint spotted Defendant walking

briskly, carrying a black bag and wearing a red shirt and tan shorts. (*Id.* at 129.) Defendant was the only person that Jackson and Swint saw on the streets at that time. (*Id.*) They then noticed that Defendant was being trailed by a woman on a bike. (*Id.*) The two security guards observed Defendant and the woman make an exchange of bags on the corner of 18th and Diamond Streets. (*Id.*) As Defendant and the woman made their way to Fontain Street, Amon noticed that the Defendant was no longer wearing the red shirt and was now wearing a white tank-top. (*Id.* at 130-31.)

At approximately 5:08 a.m., Swint made a radio call notifying the police that he had observed a man walking with a woman who was acting suspiciously, and matching some of the identification information in the flash description. (*Id.* at 132; Ex. D-CD-2 Track 1 (audio on file with Court).) Swint stated that the man had taken off a red shirt that he had been wearing and was now carrying a black bag. (Ex. D-CD-2 Track 1.) When Officer Butler received the radio transmission, he recognized Swint's voice as that of his colleague, and he proceeded in the direction of the security guards. (Hr'g Tr. 18, 23.) Within minutes of receiving the radio call, Officer Butler made contact with the security guards, who pointed him in the direction of Defendant. (*Id.* at 132.) Officer Butler approached Defendant in his vehicle as Defendant was walking west on the 1900 block of Fontain Street. (*Id.* at 25.) Officer Butler saw that Defendant matched the characteristics described in the flash description, including that he was carrying a black plastic bag. (*Id.* at 25-26.) As Officer Butler drove past Defendant he could see between the parked cars that Defendant was still carrying the black bag. (*Id.*) Officer Butler stopped his patrol car before reaching the corner of 20th Street, approximately one car length past Defendant. (*Id.* at 27.) Officer Butler then noticed that Defendant was no longer carrying the black bag. (*Id.*) Officer Butler exited his vehicle with his weapon drawn, and ordered Defendant to show

him his hands and place them on a wall. (*Id.* at 27-28, 59.) Defendant complied, and Officer Butler patted him down around his waist to feel for weapons. (*Id.* at 28.) Officer Butler then radioed for assistance. (*Id.*)

After Defendant had been stopped by Officer Butler, Security Guard Jackson located the black bag that Defendant had been carrying lodged between the wheel of a parked car and the curb. (*Id.* at 134.) The bag was located in the middle of the block, in the area that Defendant had walked past as he was heading west on Fontain Street. (*Id.*) Jackson pointed out the bag to other officers who had arrived on the scene. (*Id.* at 135-36.) Temple University Campus Police Officer Jason Santiago picked the bag up and ripped it open so that he could see the contents. (*Id.* at 216-17; Ex. D-12.) The bag contained the following items: one silver revolver, sixteen boxes of unopened Newport cigarettes, two cellphones, one 7-Eleven plastic bag, one red baseball cap, one black t-shirt, one lighter, and $67 in U.S. currency. (Hr'g Tr. 213-14; D-12; D-13; D-14 (on file with Court).) Upon learning the contents of the bag, Officer Butler placed Defendant under arrest and transported him to Central Detective Division for booking. (Hr'g Tr. 29-30; 221.)

Several hours after Defendant's arrest, Detective Ralph Domenic and his partner, Detective James Waring, were investigating whether the 7-Eleven robbery was one of a series of gunpoint robberies that had occurred in the area. (*Id.* at 89.) The detectives conducted an investigation that lasted approximately five hours. (*Id.* at 90.) At approximately 2:10 p.m., the detectives moved Defendant from his holding cell to a special investigations office. (*Id.* at 91.) Detective Domenic then gave Defendant his *Miranda* warning. Detective Domenic advised Defendant as follows:

> You have a right to remain silent and do not have to say anything at all. Anything you say can and will be used against you in court. You have a right to talk to a

> lawyer of your own choice before we ask you any question, and also to have a lawyer with you while we ask questions. If you cannot afford to hire a lawyer and you want one, we will see that you have a lawyer provided to you free of charge before we ask you any questions. If you are willing to give us a statement, you have a right to stop any time you wish.

(*Id.* at 95.)

Detective Domenic followed the warning with a series of questions, each of which elicited an oral response from Defendant. The questions and responses were as follows:

> [Det. Domenic:] Do you understand that you have a right to keep quiet and do not have to say anything at all?
>
> [Defendant:] Yes.
>
> [Det. Domenic:] Do you understand that anything you say can and will be used against you?
>
> [Defendant:] Yes.
>
> [Det. Domenic:] Do you want to remain silent?
>
> [Defendant:] No.
>
> [Det. Domenic:] Do you understand that you have a right to talk with a lawyer before we ask you any questions?
>
> [Defendant:] Yes.
>
> [Det. Domenic:] Do you understand that if you cannot afford to hire a lawyer and you want one, we will not ask you any questions until a lawyer is appointed for you free of charge?
>
> [Defendant:] Yes.
>
> [Det. Domenic:] Do you want to talk with a lawyer at this time or to have a lawyer with you while we ask you questions?
>
> [Defendant:] No.
>
> [Det. Domenic:] Are you willing to answer questions of your own free will without force or fear, and without any threats or promises having been made to you?

[Defendant:] Yes.

(*Id.* at 96-97.)

After Defendant agreed to speak with the detectives, he was questioned for approximately 30 minutes about a number of robberies that had occurred in the area. (*Id.* at 93.) Defendant admitted to the detectives that he had been involved in three of the robberies, including the one for which he had been arrested that morning. (*Id.*)

At approximately 2:45 p.m., the detectives formalized Defendant's admissions by conducting a formal written interview. (*Id.* at 94; Ex. D-17.) Before beginning the formal interview, the detectives again asked Defendant whether he had been advised of his rights and, if so, whether he had waived those rights. (Hr'g Tr. 98.) Defendant answered "yes" to both questions. (*Id.*) At the conclusion of the interview, Defendant was asked to review each page of the written interview and to correct any errors. (*Id.*) Defendant reviewed the document and then signed and dated each page of the formal interview, including the page containing the verbatim warning that he had been given, and the page reflecting the questions he had been asked and the answers he had given about his understanding of his rights and the waiver of such rights. (*Id.* at 98-100; Ex. D-17.)

## III. CONCLUSIONS OF LAW

Defendant moves to suppress (1) the physical evidence found in the bag that he dropped just prior to being stopped by Officer Butler, (2) any post-arrest statements made by Defendant while in custody, and (3) a witness identification made by a victim of one of the alleged robberies.

**A. Physical Evidence**

Defendant argues that he was illegally seized by Officer Butler. He contends that as a result of his illegal seizure, physical items recovered from a black plastic bag that he dropped should be suppressed as fruits of the officer's illegal activity. (Suppress Mem. 19-20.) The Government argues that the stop of Defendant was supported by Officer Butler's reasonable suspicion that Defendant was engaged in criminal activity. (Suppress Resp. 5-7.) The Government further argues that even if one were to somehow conclude that the stop of Defendant was not based on reasonable suspicion, the items seized from the bag should not be suppressed because the bag had been abandoned by Defendant prior to the stop. (*Id.* at 5, 7.)

Under *Terry v. Ohio*, the police may, consistent with the Fourth Amendment, stop and frisk individuals if they have a reasonable, articulable suspicion that criminal activity is afoot. 392 U.S. 1, 20-21 (1968). "An officer's objective basis for suspicion must be particularized because the 'demand for specificity in the information upon which police action is predicated is the central teaching of [] Fourth Amendment jurisprudence.'" *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (quoting *Terry*, 392 U.S. at 22 n.18). "The ultimate question is whether a reasonable, trained officer standing in [Officer Butler's] shoes could articulate specific reasons justifying [Defendant's] detention." *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003). In evaluating reasonable suspicion, courts consider the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). "Reasonable suspicion is 'a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

A review of this record demonstrates that when Officer Butler stopped Defendant, he clearly had reason to suspect that Defendant was engaged in criminal activity. Officer Butler had received a description of the individual who robbed the 7-Eleven. The suspect was described as, among other things, a thin black male who was carrying a black bag. (Hr'g Tr. 14; Ex. D-CD-2.) Officer Butler personally observed Defendant, who matched the description of the suspect, and was carrying a black bag. (Hr'g Tr. 25-26.) Moreover, prior to his encounter with Defendant, Officer Butler received a police radio transmission informing him that Defendant had removed his shirt. (Ex. D-CD-1 Track 1.) At the time of the stop, Defendant was wearing only a white tank-top. (Hr'g Tr. 130-31.) In addition, Defendant was found in close geographical proximity to the crime. Defendant was stopped approximately six blocks from the site of the robbery. (*Compare* Ex. D-1 *with* Ex. D-2 (on file with Court).) Furthermore, this robbery took place at about 4:35 a.m. Officer Butler observed Defendant shortly thereafter. Defendant and the woman trailing him on a bike were the only people on the street at that hour of the morning. (Hr'g Tr. 25, 129.) Finally, Officer Butler had cause to believe that Defendant was exhibiting nervous and evasive behavior. Officer Butler received a police radio transmission informing him that Defendant had removed a red shirt while walking within the general vicinity of the crime. In addition, before exiting his vehicle to enforce the stop, Officer Butler noticed that Defendant was no longer carrying the black bag that he had seen him with just moments before. (*Id.* at 27-28.) Given the totality of the circumstances, such behavior would lead any reasonable officer to believe that Defendant was trying to elude police by shedding items that matched those worn and carried by the robbery suspect. *See Wardlow*, 528 U.S. at 124 ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."). At a

very minimum, Officer Butler's seizure of Defendant was supported by a reasonable suspicion that he was the 7-Eleven robbery suspect.[2]

Subsequent to the legal *Terry* stop, Officer Butler was permitted to conduct a "reasonable search for weapons," because he had reason to believe that he was "dealing with an armed and dangerous individual." *United States v. Edwards*, 53 F.3d 616, 618 (3d Cir. 1995) (citation and internal quotation marks omitted). Defendant contends that the bag was dropped at the moment of seizure. We disagree. Based upon the testimony which we have found to be credible, Defendant abandoned the bag and its contents prior to being stopped by Officer Butler. Accordingly, Defendant did not have a Fourth Amendment reasonable expectation of privacy in the property. *See*, e.g., *California v. Hodari D.*, 499 U.S. 621, 629 (1991) ("The cocaine abandoned while [the defendant] was running was . . . not the fruit of a seizure, and his motion to exclude evidence of it was properly denied."); *United States v. Thomas*, 423 F. App'x 199, 204 (3d Cir. 2011) ("[B]ecause [the defendant] dropped the duffel bag and walked away from it before he was stopped by the detectives, he is foreclosed from arguing that the abandonment was precipitated by an unlawful seizure, thus mandating its exclusion.") (citation and internal quotation marks omitted).

Reasonable suspicion to stop ripened into probable cause to arrest when the silver handgun and other items believed to have been connected to the robbery were recovered from

---

[2] Although not necessary to our analysis, the Allied Barton Security Guards' own surveillance of Defendant further supports a finding of reasonable suspicion. While the security guards are not city police officers, Temple University Police consistently rely upon their observations to inform them of issues occurring on and around the Temple University campus. (Hr'g Tr. 16.) In a situation, such as here, where a suspect is believed to be armed and dangerous, the knowledge of those working closely with police can be imputed to the officer enforcing the *Terry* stop under the collective knowledge doctrine. *See United States v. Whitfield*, 634 F.3d 741, 746 (3d Cir. 2010) (applying the collective knowledge doctrine to a *Terry* seizure that took place "in a fast-paced, dynamic situation . . . in which the officers worked together as a unified and tight-knit team").

the abandoned black bag. Clearly, the stop, search, and arrest of Defendant were all legally justified.

**B. Post-Arrest Statements**

Defendant next contends that any incriminating statements that he made to police while in custody should be excluded because they had not been purged of the primary taint of his illegal seizure. (Suppress Mem. 20.) In addition, Defendant argues that the statements should be suppressed under the Fifth Amendment because of a failure to advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). (*Id.* at 21.)

As discussed above, Officer Butler's initial stop of Defendant was legally proper. The subsequent arrest of Defendant was supported by probable cause based upon all the evidence, including the evidence recovered from the abandoned black bag—one silver revolver, sixteen boxes of new and unopened Newport cigarettes, two cellphones, one 7-Eleven plastic bag, one red baseball cap, one black t-shirt, one lighter, and $67 in U.S. currency. (Ex. D-12, D-13, D-14.) Since there was no illegal seizure here, Defendant's Fourth Amendment "primary taint" argument must fail.

Even if Defendant's post-arrest statements were not tainted by an illegal seizure, they could be subject to exclusion if they were not freely and voluntarily given within the confines of *Miranda*. The constitutional protections against self-incrimination under the Fifth Amendment are triggered when a person is subject to "custodial interrogation." *Thompson v. Keohane*, 516 U.S. 99, 107 (1995). "[I]f the police take a suspect into custody and then ask him questions without informing him of [his *Miranda* rights], his responses cannot be introduced into evidence to establish his guilt." *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984).

Here, on the date of Defendant's arrest at approximately 2:10 p.m., Detective Ralph Domenic read Defendant a police document advising him of his *Miranda* rights. (Hr'g Tr. 91-92, 95.) Defendant waived his rights and agreed to speak with detectives. (*Id.* at 92.) Defendant signed and dated a document showing that he had been advised of his *Miranda* rights, and that he had answered a series of questions about those rights before he answered any questions about the robberies in which he was a suspect. (*Id.*) Before beginning the formal typed interview, the detectives again asked Defendant whether he had been advised of his rights and, if so, whether he had waived those rights. (*Id.* at 98.) To both questions, Defendant answered "yes." (*Id.*) Defendant signed and dated the typed document reflecting his answers to those questions. (Ex. D-17.) There is more than sufficient evidence from which to conclude that Defendant was informed of his rights and understood those rights. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (holding that the government must prove a defendant's *Miranda* waiver by a "preponderance of the evidence"). There is no reason to believe that Defendant did not voluntarily and intelligently waive his *Miranda* rights. There is no evidence of any coercion here. "'Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.'" *Arizona v. Mauro*, 481 U.S. at 520, 529 (1987) (quoting *Miranda*, 384 U.S. at 478).

**C. Identifications**

Defendant's final argument is that a victim's identification of Defendant should be suppressed because it is the result of Officer Butler's illegal seizure. (Suppress Mem. 20.) As discussed above, the *Terry* stop was supported by reasonable suspicion, and the subsequent arrest was supported by probable cause. Consequently, there was no illegal seizure here. In any event, the identification issue need not be addressed further, as the Government has agreed not to

introduce identifications made by any of the crime victims. (*See* Hr'g Tr. 4; *see also* ECF No. 35.) Since there will be no identification testimony, Defendant's Motion to suppress the identification made by a victim of one of the alleged robberies will be denied as moot.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Evidence will be denied. An appropriate Order follows.

**BY THE COURT:**

***/s/R. Barclay Surrick***
**U.S. District Judge**